## STOCKMEYER *v.* TOBIN.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

No. 143.   Argued and submitted January 12, 1891. — Decided March 2, 1891.

An averment in a bill, filed by the curator of an interdict in Louisiana to have a contract declared null and void, that at the time of making it the interdict was losing, and to a great extent had lost, his capacity to attend to business and to manage his affairs, and that his mind was seriously impaired so as to affect his understanding and judgment, and so continued until he was judicially interdicted, does not meet the requirements of the Civil Code of that State, and does not entitle the plaintiff to relief upon the ground that the interdict was then incapable in law of making a binding agreement.

In Louisiana a judgment debtor can waive or renounce the right to have property, which is taken on execution to satisfy the judgment, appraised.

The right of appraisement of property taken on execution is given in Louisiana to the owner, and, if waived by him, his creditors cannot complain unless the waiver was made fraudulently and to defeat their debts.

When a mortgage in Louisiana stipulates for a sale, on forfeiture, without appraisement, and the petition for executory process prays for such a sale, and the order is " let executory process issue herein as prayed for and according to law," it imports a sale without appraisement.

When a plantation in Louisiana and its fixtures are to be sold under a mortgage, the sale must be made at the seat of justice, unless the debtor, within the time after the seizure prescribed by law, requires it to be made on the plantation.

In Louisiana, when a plantation and the personal property upon it are mortgaged together by one mortgage, they may be sold together as an entirety.

In Louisiana mere informalities or irregularities in a judicial sale do not constitute a sufficient ground for setting it aside.

THE case, as stated by the court, was as follows:

This suit was instituted January 27, 1886, in the name of Edward F. Stockmeyer, an interdict, and a subject of the Ger-

man Empire, residing in New Orleans, by his curator Carl Stockmeyer, a subject of the same empire, residing in that city, against Charles P. McCan, Henry Godberry, George Godberry, Laura Godberry, Noelie Godberry and Edward F. LeBourgeois, citizens of Louisiana. Upon final hearing the bill was dismissed with costs.

Its principal object is to obtain a decree setting aside and declaring of no effect a sale and adjudication in the year 1885 to Charles P. McCan of a certain plantation in Louisiana, with all the buildings, improvements, and houses thereon, and sundry articles of personal property used in its cultivation, and establishing the rights and interests secured to Edward F. Stockmeyer by certain pledges made by public acts in the years 1881 and 1884. A further object is a decree declaring McCan a trustee in respect to the moneys realized by him from the sale of property taken possession of under the above adjudication.

The grounds upon which the above relief is sought will appear from the following summary of the pleadings and evidence:

On the 7th of February, 1881, by public act before a notary, the defendants Laura Godberry and Noelie Godberry pledged to Stockmeyer, his heirs and assigns, two promissory notes made by Henry Godberry and George Godberry to their own order and by them endorsed, dated February 20, 1880, each for the sum of $8750, payable one year after date, with interest at the rate of six per cent per annum from date until paid, with privilege to the makers of extending the notes from year to year upon payment of interest. These notes were secured by mortgage and vendor's privilege, given February 20, 1880, on a sugar plantation known as the Angelina plantation in the parish of St. John the Baptist, State of Louisiana, about forty-eight miles above the city of New Orleans on the Mississippi River.

On the 25th of January, 1884, Laura Godberry and Noelie Godberry, by public act, and for the purpose of securing an indebtedness from Henry and George Godberry in the sum of $32,000, with interest at 8 per cent per annum from February

24, 1884, until paid, and attorney's fees at 5 per cent on the amount sued for, pledged to said Stockmeyer the above two promissory notes. By this act it was agreed between Laura and Noelie Godberry and Stockmeyer that, in the event Henry and George Godberry failed to pay this indebtedness, with interest and costs, on or before January 25, 1885, Stockmeyer, his heirs and assigns, might take such legal proceedings as were deemed necessary to enforce the payment of the notes pledged, and appropriate the proceeds of sale to the payment of any amount due him on account of the Angelina plantation. The interest was paid to February 21, 1884, and payment of the notes was postponed to January 25, 1885. The land and property embraced in this special mortgage and vendor's privilege was the Angelina plantation, with the buildings, improvements, machinery, engines, apparatus, carts, wagons, tools, implements of husbandry, mules and other live stock, corn, fodder, growing crops, and everything, without exception or reservation, belonging or appertaining to that plantation.

On the same day of the last-named act, January 25, 1884, by public act, to which Henry Godberry, George Godberry, Laura Godberry, Noelie Godberry, Edward F. Stockmeyer and Charles P. McCan were parties, certain notes for $25,000, made *in solido* by Henry Godberry and George Godberry to their own order and by them endorsed, divided into sums of $5000 each, and payable at the New Orleans National Bank on the 15th, 20th and 27th days of December, 1884, and on the 5th and 15th days of January, 1885, respectively, with interest at six per cent per annum after maturity, were secured by special mortgage and crop lien on the Angelina plantation and the personal property belonging thereto, as an entirety, in favor of McCan. This mortgage, by its terms, was made superior to the one of the same date securing the indebtedness of Henry and George Godberry to Stockmeyer, as well as to that of February 20, 1880, securing the two notes of $8750 each, held by the Misses Godberry.

Subsequently, by a decree passed November 11, 1884, in the Civil District Court of the parish of New Orleans, Stockmeyer was adjudged to be incompetent to perform validly any

act that could be performed by a person of sane mind. He was, accordingly, interdicted and Carl Stockmeyer was ap-. pointed and qualified as his curator.

Upon default in the payment of one or more of these notes, McCan, the holder and owner of them, proceeded, February 25, 1886, by executory process, in the Twenty-sixth Judicial District Court, parish of St. John the Baptist, in suit No. 197 on the docket of that court, in which Henry Godberry and George Godberry were sole defendants, to seize the tract of land or plantation, together with all the personal property covered by the special mortgage to him and attached to and used in the cultivation of such plantation. At the sale ordered in that suit — which took place on the 7th of March, 1885, at the seat of justice of the parish — the plantation, with the personal property covered by the special mortgage and crop lien, and used in its cultivation, was adjudicated to Charles P. McCan for the price of $15,000 cash, and a deed was made to him by the sheriff. Under that deed, he entered into possession and sold the mules and machinery in the sugar house on the plantation for a sum approximating $10,000. He, subsequently, leased the plantation for the year 1885 to Edward Le Bourgeois for the sum of $5000, which sum he collected. He again leased it to Le Bourgeois for two years from January 1, 1886, for $10,000, and the latter, at the beginning of this suit, was in possession as lessee and tenant under McCan, whose title rested entirely on the above adjudication and deed to him.

Before the sale to McCan was made, the defendants in suit No. 197 presented to the judge of the Twenty-second Judicial District of Louisiana a petition protesting against the sale of the personal property in block or in lump at the court-house, and demanding that it be appraised and sold, separately, on the plantation. This petition was accompanied by an affidavit of counsel stating that the office of judge of the Twenty-sixth Judicial District Court of Louisiana was vacant; that there was no judge in that district or parish to act in said office, and that the judge of the adjoining district — the Twenty-second — was authorized in that event to act. Thereupon, the latter

judge made at chambers, on the 4th of March, 1885, the following order: " Upon reading the foregoing petition and considering articles 666 and 676 of the Code of Practice, let the sheriff of the parish of St. John the Baptist be, and he is hereby, directed and instructed to sell the property described in the foregoing petition in the order and manner therein set forth; and let the same be sold separately and appraised separately, as above set forth and prayed in said petition; the plantation to be sold first at the court-house, and the other articles on the plantation, as above prayed for." This petition with the accompanying affidavit, and the above order, were filed in the suit, and of the order the sheriff was notified on the 5th of March, 1885. In addition, the curator of Stockmeyer, by a writing, filed March 6, 1885, in said suit No. 197, protested against the sale of the property without the benefit of appraisement, as prescribed by law, and in the mode claimed by Henry and George Godberry. Nevertheless, the property was sold at the court-house door, in block, without appraisement; by reason whereof, it is alleged, the sale did not realize a fair value, persons who would have been present and bid for the property being prevented from attending on account of the mode in which the sale was conducted. The act of special mortgage and crop lien of January 25, 1884, by Henry Godberry and George Godberry for the benefit of McCan, contained, among others, provisions dispensing with the appraisement of the property enumerated in the event of seizure and sale; waiving all delays, appeals, writs of error and right of appeal; authorizing the holder of the notes to enter judgment in any court of competent jurisdiction, without citation or previous notice, on a production of an authentic copy of the act, for the whole or part of said debts, attorneys' fees, costs, charges, expenses, etc., provided execution was stayed until the maturity of the notes sued on; in case a forced sale became necessary from any cause, waiving and acknowledging legal service of notice to pay, notice of seizure and notice to appoint an appraiser and to subdivide, as well as all legal delays; consenting to the immediate execution of any judgment entered; promising that no injunction or process of law

tending to delay a sale should be resorted to by them, or by any one holding under them, such right or privilege being expressly renounced; consenting that all laws of the State pertaining to privileges for supplies furnished or money advanced and used in the purchase of necessary supplies, and in the payment of necessary expenses, laborers, etc., to carry on a farm or plantation, should have full force and effect; and obligating themselves to ship and consign to the mortgagee the entire crop of sugar and molasses made and gathered on the Angelina plantation during the year 1884, or his representative and assigns could at once sequester the crops or the proceeds thereof, in whosesoever hands the same might be, regardless of any sale or transfer thereof, and ship the same, if in kind, to McCan, who was empowered to sell them at the current market prices and hold the net proceeds in lieu of the property sequestered.

These stipulations, in the special act of mortgage and crop lien, were alleged to be illegal and not binding upon Henry and George Godberry, or through them upon any creditor or junior mortgagee, particularly the plaintiff or said interdict, even if the latter was adjudged to have lawfully signed it, which the plaintiff denied.

The bill avers that the defendants Laura and Noelie Godberry, at the date of the above act, January 25, 1884, were not the holders and owners of the two promissory notes for $8750 each, but that they had been pledged to Stockmeyer, first by the act of February 7, 1881, and again by the act of January 25, 1884, and that he held a special property in them to secure his debt; that the special act of mortgage and crop lien of the latter date was not intended to subordinate the pledge of Stockmeyer to the claim and notes of McCan, and could not properly be so interpreted; that there was no consideration for Stockmeyer to subordinate his right of pledge to the special mortgage and crop lien of McCan; that at that time, January 25, 1884, Stockmeyer " was losing and, to a large extent, had lost his capacity to attend to business and to manage his affairs; that his mind was seriously impaired so as to affect his understanding and judgment, and he so continued until in

the month of November, 1884," on the 11th day of which month he " was judicially interdicted, but on or about the 20th day of February, 1884, previous thereto, was placed in an asylum ; " that "said act was not the expression of a sound mind and is illegal and void and not binding on Stockmeyer, his heirs or assigns, and that the proceeding to seize and sell the property therein enumerated was illegal, void and of no effect" as to his rights or the rights of his curator ; that if the special mortgage be illegal and void as against him, the pledges, one or both, made by Laura Godberry and Noelie Godberry on the 7th of February, 1881, and January 25, 1884, were subsisting pledges and first mortgages and privileges on said property ; and that the debts due to Stockmeyer should be first paid from the proceeds of the sale of the property pledged.

The prayer of the bill is that the sale and adjudication of the Angelina plantation, as well as said act of special mortgage and crop lien in favor of McCan, be cancelled and declared null and void ; that the pledges by the act of February 7, 1881, and January 25, 1884, be recognized and established, and the property so pledged be sold ; that the debts due Stockmeyer from Henry and George Godberry be ascertained ; that McCan be adjudged to be a trustee for the moneys realized by him from the sale and adjudication of March 7, 1885 ; and that such further relief be granted as the nature of the case requires.

The answer of McCan proceeds upon these grounds : That the two acts of January 25, 1884, were executed at the same time and for a common purpose ; that prior to that date, Stockmeyer made advances to the amount of $32,000 to Henry and George Godberry to enable them to carry on the Angelina plantation ; that said debtors, being unable to repay said sum, and there being no prospect of their being able to do so unless the sum necessary was made out of future crops, applied to defendant some days before January 25, 1884, for a loan of $25,000 to be used in purchasing supplies for that year, and to be secured by a first mortgage ; that Stockmeyer knew of and approved of that application, for he intervened

in the act of special mortgage and crop lien, without solicitation from the defendant, and bound himself to the stipulations contained in it; that defendant refused to make the loan unless the holders and owners of the two notes of $8750 each, which were outstanding and secured by first mortgage on the plantation, would consent to give his mortgage priority over them; that by said stipulation the plaintiff postponed his rights of mortgage in favor of the defendant; that the protest and petition filed by th  curator in case No. 197 shows that Stockmeyer became a party to the act of mortgage and crop lien for the purpose of waiving his claim as holder of said two notes; that prior to, as well as on, the 25th of January, 1884, he was engaged in and transacted business in New Orleans, apparently in the full enjoyment and use of all his mental faculties, and defendant had no reason to believe that they were, in any degree, impaired by insanity, or from any other cause; that the defendant has no knowledge or information as to his having lost his capacity to attend to business and manage his affairs, or as to whether his mind was seriously impaired so as to affect his understanding and judgment; that defendant was not intimate with him, having had only casual intercourse with him, but from the fact of his attending to business, he believed him to be in his right mind when the mortgage and crop lien were executed; that on or about September 27, 1884, his curator agreed and consented to defendant's making further advances to the plantation over and above the $25,000 secured by the special mortgage of January 25, 1884; that no infirmity of intellect upon the part of Stockmeyer was suggested by the curator in the petition and protest filed to prevent the sale of the mortgaged property; and that if the curator had given notice of his purpose to repudiate the stipulation in the act of special mortgage on the grounds now urged, the defendant would not have made the advances he did, nor would he have sold the property in dispute, if the claims now put forward had been made known to him.

The answer also alleges that the sale of the mortgaged property by the sheriff, under executory process, was in all respects legal and valid; that it was competent for the

mortgagors to make the waivers embodied in the mortgage, and the mortgage having been signed, he consented to its terms and conditions, and is bound by them; that the mules and other personal property covered by the special mortgage, and not sold on the plantation, were used in the cultivation of the plantation, were attached thereto, and were immovable by destination; that the sheriff had advertised the same, together with the plantation of which they formed a part, for sale, according to law, at the seat of justice of the parish; that the petition and protest of the plaintiff, who was joined therein by Laura Godberry and Noelie Godberry, were filed long after the seizure and date of the first publication of the notices of sale, and was not a demand for a sale of the seized property, or any part thereof on the premises, but if it be so construed, it was made after the right to the same had expired, and not by the defendants in the writ, and the sheriff was not bound to comply with any such notices; that it would have been irregular and illegal to have sold a part of the property at a place different from that named in the notice of sale; that the protest was presented to the defendant on the day, and only a few minutes before the time advertised for the sale; that, as the plantation was on the opposite side of the river, ten miles from the seat of justice, the plaintiff knew that compliance with the protest was impossible; that the judge who granted the order directing the sheriff to sell according to the terms of the protest, had no power to grant the same; that the petition upon which it was granted did not pray for process against the sheriff or the defendant, nor has any been issued or served, and the suit has not been prosecuted in any manner to final judgment; that such order decided nothing between the defendant and the complainant that ought to affect the sale; that the plantation, mules, machinery and implements thereon constituted an estate complete for the purpose of cultivating sugar cane and manufacturing its products, and it was more valuable as a whole than it would have been if sold separately in the manner set forth in the protest; that the amount due him, on the day of sale, for advances, was $20,707.39, with legal interest from January 10, 1885; but that the property was sold for

only $15,000, leaving a large balance due him, which remains unpaid, together with accrued interest.

The defendant admits that he received from Le Bourgeois $4000 for the rent of the property for the year 1885; that he has rented for two years from January 1, 1886, at $5000 per annum; and that he has given Le Bourgeois the privilege of purchasing at the expiration of his lease for $15,000, payable in instalments. After the answer was filed both Edward F. Stockmeyer and McCan died, and the suit was revived in the name of C. Stockmeyer, testamentary executor of E. F. Stockmeyer, against t'.e appellees, the widow and children of McCan. Upon final hearing the bill · was dismissed with costs.

*Mr. Alfred Goldthwaite* for appellant submitted on his brief.

*Mr. J. D. Rouse* for appellee. *Mr. William Grant* was with him on the brief.

MR. JUSTICE HARLAN, after making the above statement, delivered the opinion of the court.

The case will be considered in the two aspects in which it is presented in behalf of the appellant. The first one is, that at the time Edward F. Stockmeyer entered into the agreement of the 25th day of January, 1884, before the notary, he was in a condition of great mental weakness; that there was gross inadequacy of consideration for the mortgage; and that from these circumstances imposition or undue influence ought to be inferred.

The bill does not allege that Stockmeyer was incapable, in law, of executing the agreement in question. The averment that at the time of making it he was losing, and to a great extent had lost, his capacity to attend to business and to manage his affairs, and that his mind was seriously impaired so as to affect his understanding and judgment, and so continued until he was judicially interdicted by a judgment rendered November 11, 1884, does not meet the requirements of the Civil Code of Louisiana. By that Code it is provided:

"Art. 401. All acts done by the persons interdicted from the date of the filing of the petition for interdiction until the day when the same is pronounced are null. Art. 402. No act anterior to the petition for interdiction shall be annulled, except where it shall be proved that the cause of such interdiction notoriously existed at the time when the acts, the validity of which is contested, were made or done, or that the party who contracted with the interdicted person could not have been deceived as to the situation of his mind. Notoriously, in this article, means that the cause of the interdiction was generally known by the persons who saw and conversed with the party. Art. 403. After the death of a person, the validity of acts done by him cannot be contested for cause of insanity, unless his interdiction was pronounced or petitioned for previous to the death of such person, except in cases in which the mental alienation manifested itself within ten days previous to the decease, or in which the proof of want of reason results from the act itself which is contested."

Other articles of the Code are as follows: "Art. 1782. All persons have the capacity to contract except those whose incapacity is specially declared by law. These are persons of insane mind, those who are interdicted, minors and married women. Art. 1783. All cases of incapacity are subject to the following modifications and exceptions. Art. 1784. Persons interdicted can, in no case whatever, make a valid contract after the petition has been presented for their interdiction until it be legally removed. Art. 1788. The contract, entered into by a person of insane mind, is void . . . for want of consent. It is not the judgment of interdiction, therefore, that creates the incapacity, it is evidence only of its existence, . . . and from these principles result the following rules: 1. That, after the interdiction, no other evidence than the interdiction itself is necessary to prove the incapacity of the person, and to invalidate any contract he may have made after the day the petition for interdiction was presented . . . 2. As to contracts made prior to the application for interdiction they can be invalidated by proving the incapacity to have existed at the time the contracts were made. 3. But in order to pre-

vent imposition, it is not enough to make the proof mentioned in the last rule; it must also, in that case, be shown that the person interdicted was known by those who generally saw and conversed with him, to be in a state of mental derangement, or that the person who contracted with him, from that or other circumstances, was acquainted with his incapacity. 4. That, except in the case of death, hereafter provided for, no suit can be brought . . . to invalidate a contract on account of insanity, unless judgment of interdiction be pronounced before bringing the suit. . . . 5. That if the party die within thirty days after making the act or contract, the insanity may be shown by evidence, without having applied for the interdiction; but if more than that time elapse, the insanity cannot be shown to invalidate the act or contract, unless the interdiction shall have been applied for, except in the case provided for in the following rule : 6. That if an instrument or other act of a person deceased contain in itself evidence of insanity in the party, then it shall be declared void, although more than thirty days have elapsed between the time of making the act and the death of the party, and although no petition shall have been presented for his interdiction. 7. In the case mentioned in the preceding rule, other proofs of insanity may be offered, etc. 8. That where insanity is alleged to avoid a donation or other gratuitous contract, it is not necessary to show that the insanity was generally known; it will be sufficient to show that it existed, and if the party be dead, without having been interdicted, it is not necessary to show in this case that interdiction had been applied for."

It is apparent from these provisions that the allegations of the bill as to the condition of Stockmeyer's mind on the 25th of January, 1884, do not entitle the plaintiff to relief upon the ground that he was incapable in law of making a binding agreement. And the proof fails to show that the persons who at that time generally saw and conversed with him, knew or even believed him to be in a state of mental derangement, or that McCan had any ground whatever to doubt his capacity to contract. *Louisiana Bank* v. *Dubreuil*, 5 Martin, 416, 425;

*Phelps* v. *Reinach*, 38 La. Ann. 547.   On the contrary, the evidence shows that when he intervened in the McCan mortgage, he was, although of peculiar and at times eccentric manners, not incompetent for the transaction of business. He recognized the fact that Henry and George Godberry needed more money to carry on their plantation, and that, unless they obtained it, his interests under the prior pledge would be put in peril.   He was not himself able to make further advances, and approved, if he did not suggest, that application be made for that purpose to McCan.   The latter agreed to make advances for the current year only upon the condition, among others, that his mortgage and crop lien should take precedence of all others.   This Stockmeyer perfectly understood and distinctly assented to with full apprehension of what he was doing.   And that condition was plainly expressed in the contract; for it is therein stipulated that the mortgage and privilege then existing for the two notes for $8750 each, as well as for the indebtedness to Stockmeyer of $32,000 for and on account of advances to the Angelina plantation, were "subordinate" to the McCan notes and mortgage. The testimony of the notary before whom the McCan mortgage was executed is positive to the effect that, at that time, there was nothing peculiar in Stockmeyer's conversation, and that he presented the same appearance as on several previous occasions when transacting business with that officer.   The truth is, that Stockmeyer's mind did not commence to give way, so far as his friends could perceive, until within a few days — not more than a week or ten days — prior to February 20, 1884, when he was transferred to the Louisiana Retreat for the Insane.   The physician who examined him on that day, and by whose advice he was removed to that institution, testified that he was engaged in the transaction of his business all the time until about a week before being committed to the asylum.   Undoubtedly he was, on and after that date, incapable of making a binding contract.   But we are not to infer incapacity to have existed on the 25th of January, 1884, from the mere fact that he became insane within a few days before his removal to the asylum for treatment.

The suggestion that there was gross inadequacy of consideration is without force. Stockmeyer consented that his mortgage be subordinated to McCan's, because, in his judgment, further advances to the plantation could not be otherwise obtained, and without such advances he supposed, and reasonably, that it would run to waste, destroying all chance to save his debt. Besides, the advance by McCan, in consideration of his mortgage being accorded priority, was enough to sustain the agreement to that effect.

After a close scrutiny of all the evidence we are of opinion that nothing is disclosed to support the contention, that the McCan mortgage and crop lien were obtained by imposition or undue influence. No such inference is justified by the evidence.

The other aspect in which the case is presented by the appellant involves the validity of the sale by the sheriff under the proceedings for executory process. The first point made in support of this general contention is that the clause in the McCan mortgage, dispensing with appraisement, was not valid or binding under the laws of Louisiana; that, without appraisement, a legal sale could not occur. Under the Louisiana law, Code of Practice, 1870, art. 745, " when the Sheriff sells property which he has seized conformably to the provisions contained in this chapter [relating to executory process], he must cause the same appraisements to be made, and observe the same delays and formalities, as are prescribed for the sale of property seized in execution." The latter sales are provided for in Article 663 to 704 inclusive of the Code. In *Levicks, Barrett & Kuen* v. *Walker*, 15 La. Ann. 245, — a case much relied upon by the appellant — the suit was upon a note executed in Pennsylvania, the maker describing himself as residing in Louisiana, and promising to pay, without defalcation, and " without any relief whatever from appraisement or valuation laws." Judgment, in that form, was refused, and the plaintiff appealed. Chief Justice Merrick, in affirmance of the judgment, said: " We think the stipulation in a contract that the property of the debtor shall be sold without appraisement in the event of non-payment at maturity, one of those pacts which ought not

to be recognized by our courts in the decree rendered upon such contract. The law has, by express provisions, ordained the mode in which its own officers shall enforce the judgments of the courts." Justices Land and Buchanan held that the right of the debtor to appraisement in case of the forced aliena-tion of his property might be waived by him, and his property sold at the first offer for cash for whatever price it would bring. But they concurred in the judgment of affirmance because "the waiver in such a case must be in a more solemn and authentic form than that of a promissory note, otherwise the waiver would become a mere *formula* in such instrument, and the entire policy of the law would thereby be defeated, to the injury of both debtors and creditors."

The subject was elaborately considered by the Supreme Court of Louisiana in *Broadwell* v. *Rodrigues*, 18 La. Ann. 68, where the question was whether the clause inserted in the act of mortgage there in suit, dispensing with the appraise-ment required by Arts. 673 and 745 of the Code of Practice, was valid in law. The case turned upon the construction to be given to Article 11 of the Civil Code of Louisiana, pro-viding that, "individuals cannot by their conventions derogate from the force of laws made for the preservation of public order or good morals. But, in all cases in which it is not expressly or impliedly prohibited, they can renounce what the law has established in their favor, when the renunciation does not affect the rights of others and is not contrary to the pub-lic good." It was contended on one side, that the law requir-ing the property of a judgment debtor to be appraised before it could be sold by the sheriff in execution of a judgment, is a public law, and that an agreement to waive or dispense with the appraisement is absolutely void; and on the other, that the necessity for appraisement in judicial sales is established exclusively for the benefit of the defendant, and that he may, therefore, validly renounce it under the second paragraph of Article 11 of the Civil Code. The court said: "From the general tenor of our own jurisprudence, we could hardly have deemed this question an open one, for it has been uniformly held that the legal formalities attending final process are

established by law in favor of debtors in execution, which they can renounce, without in any manner running counter to the proviso in the second paragraph of Art. 11, C. C. The cases to which our attention has been called view the question in all its phases, and seem to consider the progressive steps in the execution of judgment as mere formalities; less a matter of public policy than of private concern, and hence they deem the renunciation or waiver of those rights as permissible under § 2 of Art. 11 of the Civil Code." The prior cases referred to in the opinion as sustaining these views were *Mullen* v. *Harding*, 12 La. Ann. 271; *LeBlanc* v. *Dubroca*, 6 La. Ann. 360; *McDonough* v. *Garland*, 7 La. Ann. 143; *Desplate* v. *St. Martin*, 17 La. Ann. 91, 92, and others. To the same effect are *Jouet* v. *Mortimer*, 29 La. Ann. 206; and *Soniat* v. *Miles*, 32 La. Ann. 164. So, that the objection that the sale was illegal for want of an appraisement is without any foundation upon which to rest.

But it is said that the Godberrys could not by their agreement with McCan waive appraisement so as to affect Stockmeyer or the vendor's mortgage and privilege securing the notes that had been pledged to him. This contention, it is supposed, finds support in Article 2078 of the Revised Civil Code, providing that "several obligations are produced, when what is promised by one of the obligors is not promised by the other, but each one promises separately for himself to do a distinct act; such obligations, although they may be contained in the same contract, are considered as much individual and distinct as if they had been in different contracts and made at different times." To this suggestion it is sufficient to answer that the right of appraisement is given by the statute to the owner, and its waiver by the Messrs. Godberry was not a matter of which creditors could complain, unless such waiver was made fraudulently or to defeat their debts, as in *Lawrence, Syndic* v. *Young*, 1 La. Ann. 297, 299; certainly not one of which any creditor could complain who intervened and became a party to the mortgage dispensing with appraisement.

It is also said, that in the writ commanding the sheriff to seize and sell, he was required "to seize, and, after the legal

delays, to advertise and sell, *according to law;*" and that as he was not directed to sell *without appraisement*, he could only sell in the mode prescribed by the statute, that is, upon appraisement. *Union Bank* v. *Bradford*, 2 La. Ann. 416, is cited in support of that proposition. That was an action to annul a sale of land under execution by the sheriff. The mortgage, given by the defendants, contained a clause authorizing a sale "for cash, without appraisement." In the petition praying for the order of seizure and sale, no reference was made to this clause, and the right to sell without appraisement was not claimed. The prayer was for an order that the property be seized and sold "as the law directs," etc. An order of seizure and sale was directed to be issued, "as prayed for," and that the property be sold "as the law directs." Under this order, the clerk issued the writ, directing the sheriff to seize and sell for cash, without appraisement; and the sale was so advertised. The court said: "It is manifest that the sale was not made in conformity with the order of the judge. The stipulation in the act of mortgage was one made for the benefit of the plaintiffs, which it was discretionary with the bank to have enforced or to renounce. It was virtually waived by claiming a seizure and sale according to law, the true intendment of which is, that the proceedings were to be in conformity with the rules which govern seizures and sales under executory process. The order was in accordance with the prayer of the petition, and no sale could have been legally effected under it, without observing the formalities required in ordinary cases under executory proceedings, one of which is, that the property shall be previously appraised. The clerk was not authorized, under the order granted by the judge, to direct that the sale be made without appraisement. His act was null, and conferred no authority on the sheriff to dispense with the observance of a formality which was so essential, as the result proves, to the protection of the plaintiffs' rights." The facts here are entirely different from those in the above case. The petition of McCan for executory process asks that the mortgaged property be seized and sold for cash to the highest bidder, "without appraisement and according to law."

The order upon the petition was, " Let executory process issue herein as prayed for and according to law." The writ of seizure and sale directed the sheriff " to seize, and, after the legal delays, to advertise and sell, according to law, . . . to pay and satisfy in cash the claim of the plaintiff," etc. The writ, it is true, did not in terms require the sale to be made without appraisement. But the omission was not one of which Stockmeyer could complain after intervening in the special mortgage to McCan; certainly not unless he showed special injury to his rights. Besides, we think, in view of the petition and order.for executory process, the words "according to law" in the writ imported a sale in accordance with the stipulations of the mortgage and the prayer in the petition, namely, without appraisement. There is no ground.to say, as in the case in 2 La. Ann., that the mortgagee, by his petition, or in any other mode, waived his right to a sale without appraisement and asked a sale under the statute with appraisement.

Another question is, whether the sale was invalid by reason of the entire property having been sold, in block, at the seat of justice, and not, as to any portion of it, on the plantation. By Article 664 of the Code of Practice it is provided that .the sale of the property under a writ of *fieri facias* " must be made by the sheriff at the seat of justice for the parish where the seizure is made, and he shall choose for the place of sale the spot where it may have the greatest degree of publicity, except in the cases enumerated in the following articles." Art. 665 : ·" In the country, the sale may be made on the plantations which are to be sold if the debtor require it; but in this case notice must be given of the fact in the advertisement of sale." Art. 666 : " Animals and utensils attached to plantations and manufactures, and such articles as cannot be easily removed, must be sold on the spot where they are taken, on the day and hour appointed for this purpose by the sheriff." Art. 676 : " The effects seized must be appraised with such minuteness that they may be sold together or separately, to the best advantage of the debtor, as he may direct."

Now, the objection as to the place of sale is fully met by *Walker* v. *Villavasso*, 26 La. Ann. 42, 44, (decided in 1874 )

where the court, after quoting Article 666, said : "The two preceding articles [664, 665] provide that sale of the property must be made at the seat of justice, but in the country it may be made on the plantations which are to be sold, if the debtor require it, of which notice must be given in the advertisement. These articles must all be construed together so as to give effect to each. Where a plantation and its fixtures are to be sold under a mortgage, as in this case, the sale must be made at the seat of justice, unless the debtor require it to be made on the plantation. It is not intended that the articles attached to the plantation and which are mortgageable shall be sold in one place and the land in another. Under the writ of seizure and sale all are seized and sold at one time and place." And, perhaps, that the privilege given to the debtor might not be abused, the general assembly, by the act of March 2, 1876, relating to sales by sheriffs and coroners, Laws of La. 1876, p. 50, declared that nothing therein contained " shall deprive the defendant of the privilege now enjoyed by him of having his property, when it is under seizure, offered for sale at his domicil upon his giving notice to the proper officer within three days after seizure." The necessity for this limitation as to the time within which the defendant must indicate his wishes as to the place of sale is shown by the occurrences in this case. The petition of McCan was filed and executory process directed to be issued on the 15th of January, 1885. Notice of demand and service of copy of petition were waived by the debtors January 19, 1885; the seizure was made January 27, 1885; the sale was advertised January 31, 1885, to take place March 7, 1885, the advertisement stating that the plantation and the personal property attached to it, and used in its cultivation, would be sold for cash at the courthouse of the parish; and a copy of the petition of protest by debtors, with the accompanying affidavit, and the order of the judge of the 22d Judicial District, requiring the plantation to be sold at the court-house, and the other articles at the plantation, was not served on the sheriff until March 5, 1885, three days only before the day on which the sale was to occur according to the advertisement. It thus appears that, in any

view of the statute, the demand for the sale of the personal property on the plantation, apart from the plantation, was out of time.

As to the effect upon the sale of the order made at chambers by the judge of the Twenty-second Judicial District, directing that the personal property covered by the McCan mortgage be appraised and sold separately on the plantation, but little need be said. Touching this order it may be observed that the counsel for the appellant does not refer to any statute of Louisiana conferring upon the judge who made it the power to act in any case pending in another district, in which there is an actual vacancy in the office of judge ; while the counsel for the appellees say that if any authority exists for the exercise of such a power they have been unable to find it in the laws of that State. It does not seem to us that this order, made without citation or prayer for citation against the party to be affected by it, can have the force of a judgment, nor did it authorize the sheriff to depart from the terms of the advertisement of sale, in respect either to the place of sale or the mode of conducting it. In view of the terms of the advertisement, a sale in conformity with the above order, without readvertisement, would have been irregular, if not invalid. This order is liable to the same objection as the one before this court in *Freeman* v. *Dawson*, 110 U. S. 264, 270, of which it was said : "The action of the circuit judge in directing the recall of the executions in vacation, out of court, without notice to the judgment creditor, was irregular and unauthorized, and of no legal validity."

It is contended with much earnestness that the sale of the personal property in a lump, along with the plantation, was unauthorized by the statute and void. We are not satisfied of the soundness of this view. In *Morris* v. *Womble, Sheriff*, 30 La. Ann. 1312, 1314, the question was, whether the debtor, who had specially mortgaged his plantation, with all the buildings and improvements thereon, was entitled, of right, to have the plantation sold in lots. The court, after observing that, in the case of a *fi. fa.* on an ordinary judgment, the debtor has the right to point out the property he desires sold, provided it

be available and sufficient, says : "But the case we conceive to be very different where the debt for which the sale is made bears special mortgage on the thing to be sold, and where the thing has been mortgaged as *an entirety, a unit*, and thus made by contrast and in contemplation of the parties *indivisible*, whether so by nature or not." "Thus," the court proceeds, "where a plantation, with its accessories, has been specially mortgaged, the stock, implements, etc., thereto attached by the owner, and therefore made immovable by accession, cannot be sold separately from the plantation itself, no more than can a house or other building on it. When the law gives the mortgage creditor the right to seize the whole thing mortgaged, it gives him the right to sell the whole thing, if it be indivisible by nature or only so by the agreement and contract of the parties."

But if it be assumed that the personal property used in the cultivation of the plantation, and embraced in the special mortgage, ought not to have been sold in block with the plantation, but each article separately, the failure to do so did not render the sale void. The utmost that could be said is that the sale was informal and irregular. But in Louisiana mere informalities or irregularities in a judicial sale do not alone constitute a sufficient ground for setting it aside. The bill alleges that the property did not bring a fair value, and that, by reason of the mode of sale, persons who would have bid did not attend, and were prevented from bidding. These allegations, if material, are not sustained by proof. Nor is there sufficient proof that the property, if resold, would bring any larger price than McCan bid for it, or would be sufficient to discharge his claim in full. The plaintiff does not propose that he, or any one else, will, at a resale, bid any larger sum than McCan paid. Nor have the Godberry brothers, since the sale, made complaint of unfairness in it. Under such circumstances, it not appearing that any real injury has been done to the plaintiff, the sale should not be disturbed because of omissions or informalities that did not affect the substantial rights of the party complaining. In *Copeland* v. *Labatut*, 6 La. Ann. 61, the court said: "The petition contains no alle-

gation and the record no proof of any injury having been sustained by the plaintiff, in consequence of the informalities alleged; and no offer on the part of the plaintiff to warrant that the property, if resold, would bring a higher price than it did before. Under the rule which we have found it necessary to adopt, those omissions would prevent us from disturbing the judgment, even if the informalities were much more material than they actually are." So, also, in *Mullen* v. *Harding*, 12 La. Ann. 271–2 : " Unless the plaintiffs can show that they have suffered injury by the informalities complained of, they ought not to be permitted to attack the validity of the proceedings." *Barret* v. *Emerson*, 8 La. Ann. 503, 504; *Stockton* v. *Downey*, 6 La. Ann. 581, 585; *Coiron* v. *Millaudon*, 3 La. Ann. 664; *Desplate* v. *St. Martin*, 17 La. Ann. 91, 92; *Seawell* v. *Payne*, 5 La. Ann. 255, 260.

*Decree affirmed.*